**Coy Andrew PRICE, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–75–555.**

Court of Criminal Appeals of Oklahoma.

Feb. 2, 1976.

Irvin Owen, Shawnee, for appellant.

Larry Derryberry, Atty. Gen., Michael Jackson, Asst. Atty. Gen., for appellee.

## OPINION

BRETT, Presiding Judge:

Appellant, Coy Andrew Price, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Pottawatomie County, Case No. CRF–74–570, for the offense of Unlawful Delivery of Marihuana, in violation of 63 O.S.1971, § 2–402, ¶ B 2. His punishment was fixed at a term of two (2) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

Early in the evening of November 5, 1974, Dennis Dill, an undercover narcotics

agent for the District Attorney's Office of Pottawatomie County, met with Detective Gary Rogers at a prearranged location at which time they placed a transmitter on Dill's left leg. He told Detective Rogers that he intended to go to Coy Price's house and attempt to purchase a bag of marihuana. He then picked up a person by the name of Darrell Caudill and went to Price's house arriving at approximately 8:00 that evening. Upon being admitted to the house, he asked if anyone had marihuana for sale. Coy Price replied that he did and instructed them to follow him to the bedroom. Price opened a drawer in the dresser and took out a brown paper sack containing two or three bags of marihuana and told Dill to take his pick. Dill did so and gave Price a ten dollar bill for one baggie. At this point in his testimony, Dill identified the defendant as the man from whom he had purchased the marihuana on that evening. Dill remained at the house for a few more minutes and then left. At approximately 11:00 p. m., he again met with Detective Gary Rogers at a prearranged location and turned over the bag of marihuana that he had bought from Price.

On cross-examination, Dill admitted that he personally had used numerous drugs but that he had not indulged in the use of any drugs since becoming an undercover narcotics agent. Further, he admitted to using several different aliases throughout Oklahoma while working as an undercover agent. Also, he indicated that Darrell Caudill had helped him by pointing out several potential dealers or users of drugs in the community. He further stated that he normally carried between $20.00 or $40.-00 given to him by the District Attorney's Office to make drug purchases, but that he could not remember whether the money he used to purchase the baggie from Mr. Price was given to him that evening or on a prior occasion. Further, he testified that Detective Rogers did not search him prior to the time that he went to the Price house to purchase the marihuana.

Detective Rogers testified that approximately 6:30 on the evening in question he met with Dennis Dill at a prearranged location west of Shawnee, Oklahoma, at which time he made arrangements with agent Dill for a transmitter to be placed on him and to discuss where the purchase was to be made. The purchase was to be made at 225 West 35th Street in Shawnee. At the appointed time, he proceeded to the said residence and parked one block south and directly behind the residence. He estimated that he was approximately 75 yards from the house. He stated that he had heard the voice of Dennis Dill over a transmitter before and that at approximately 8:00 that evening he began to recognize his voice over his receiver. He heard Dill walking up to the door and knocking and then some general conversation in which agent Dill was asking if there were any marihuana for sale. He heard some steps as though they were walking to some other place in the residence and also testified to hearing some conversation about the price of marihuana, which he believed was a figure of $10.00. He also heard some talk about some angel dust and some speed. He stated that agent Dill was in the residence for 15 minutes at the most. After agent Dill left, Rogers left and was contacted at approximately 10:30 that evening and again met with agent Dill and picked up the plastic bag containing the green leafy substance which was purchased by agent Dill. He took the substance to the evidence locker at the Police Department and on the following afternoon turned it over to Investigator Dan McGehee.

On cross-examination Detective Rogers explained that if the police use an individual for an undercover agent who is not commissioned as an agent, police officer or investigator they do use the procedure of shaking the individual down, frisking him, checking his immediate area and keeping him under surveillance at all times. However, in the case of Dennis Dill, he was an investigator employed by the District At-

torney's Office and had signed a loyalty oath and, therefore, it was not necessary to follow this procedure with him. At this point the State rested its case in chief.

The defendant took the witness stand in his own behalf and testified that he had only seen Dennis Dill one time previous to having seen him in court, and that one time was on the night in question. He stated that there had been a party on the evening in question and that numerous friends were in attendance, one having brought some marihuana. Relative to the issue of the use of marihuana on the evening in question, the transcript of trial reveals the following questions asked of, and answered by, the defendant:

"Q. Now you had yourself smoked some that evening?

"A. Yes Sir.

"Q. Do you habitually smoke Marihuana?

"A. No Sir, Marihuana don't do that much for me.

"Q. Do you sell Marihuana?

"A. No Sir.

"Q. Do you handle it, or have it in your possession with an intent to distribute?

"A. No Sir." (Tr. 46)

On cross-examination the defendant stated that he had smoked marihuana once or twice. He further stated that he had been in the Marines but had received an undesirable discharge on the basis of unauthorized absence. He was then questioned as to whether he had ever been convicted of a crime and had replied that he had been convicted of petty larceny.

On re-direct examination one question was asked. The defendant was asked if he had ever been convicted of a felony to which he replied that he had not. At this point the defense rested.

▮▮▮▮ The defendant's first assignment of error alleges that the trial court erred in failing to instruct on the offense of Possession of a Controlled Dangerous Sub-

stance, as requested in defendant's proposed instruction number 1, which provided as follows:

"If you find that defendant, Coy Andrew Price, was in possession of Cannabis sativa L., a controled drug, but with no intention to distribute, you are instructed that this could be what is known as an included offense of possession, a misdemeanor.

"If you so find, you are instructed to fix punishment at not to exceed one year in the county jail."

This contention cannot be sustained. This Court held in the early case of *Jones v. State*, 12 Okl.Cr. 255, 154 P. 689 (1916), as follows:

". . . Where there is evidence that might tend to lessen the offense, or to reduce the crime to a degree lower than that charged in the indictment, or information, it is the duty of the trial court at all times to fully instruct the jury as to the law upon such lower degrees, or included offense. But where there is no evidence to support such lower degree, or included offense, it is not only unnecessary to instruct thereon, but the court has no right to ask the jury to consider such questions. . . ."

In the case at bar, if the evidence of the State is to be believed, this defendant was guilty of unlawful delivery of marihuana and nothing less. On the other hand, if the defendant's testimony must be believed, that is, testimony offered by him in his defense, then he was guilty of no crime whatsoever. We base this conclusion on the fact that after a careful review of the record of the instant case, we can find no evidence to refute the allegations of the information relating to delivery of the controlled dangerous substance other than the defendant's denial. In fact, the defendant testified that he did not possess marihuana, distribute marihuana, nor intend to distribute marihuana. Therefore, finding no evidence whatsoever to refute the allegations of the information it follows that the defendant would not be entitled to an in-

struction that would permit the jury to find the defendant guilty only of the lesser included offense. An instruction on a lesser included offense must be justified by the evidence presented. See, *Swenson v. State*, Okl.Cr., 525 P.2d 1395 (1974). Accordingly, it is our opinion that no substantial right of the defendant was violated for failure to instruct on the lesser included offense, and that the defendant's first assignment of error is without merit.

 In the second assignment of error, defendant argues two propositions of law. First, the defendant was prejudiced and denied a fair trial when the following occurred during the direct examination of Officer Rogers (Tr. 37-38):

"Q. Go ahead.

"A. As I stated, I could hear general conversation, talk about Marihuana being for sale, and heard some steps apparently they had to walk some place in the residence, there was also conversation about price of the Marihuana, I believe it was ten dollars that was discussed, also there was some talk about some Angel-dust and also some speed that . . .

"MR. OWEN: Now, Your Honor, that's highly prejudicial and we move for a mistrial.

"THE COURT: Overruled.

"MR. OWEN: Let me make a record.

"(Thereupon the following proceedings were had at the Bench and out of the hearing of the Jury).

"MR. OWEN: Your Honor, this is a non-responsive answer that has been given by this witness, and reference has been made to Angel-dust and speed from a group of people while he was listening on his radio with no attribution to a particular individual, which is highly inflammatory and prejudicial and in a trial of this kind a mistrial should be declared at this point.

"THE COURT: Objection overruled, let's confine this Mr. Richards, to the Marihuana case that is involved here.

"(Thereupon, the proceedings were continued in the hearing of the Jury, as follows).

"THE COURT: The Jury is admonished to disregard any mention of Angel dust or speed at this time."

It is this Court's opinion that the testimony complained of in the instant case is not grounds for reversal. The court's admonition to the jury not to consider the remarks of counsel, or a witness, usually cures an error unless it is of such nature, after considering the evidence, that the error appears to have determined the verdict. See, *Goodwin v. State*, Okl.Cr., 506 P.2d 571 (1973). Considering the evidence of accused's guilt with the court's admonition of the jury not to consider the testimony complained of, and the fact that the accused received the minimum sentence, this Court finds in light of the entire record that the above error is harmless as it did not prejudice the jury nor influence their verdict. Also see, *Kitchens v. State*, Okl. Cr., 513 P.2d 1300 (1973).

 Finally, the defendant alleges in his second assignment of error that it was improper to allow the defendant to be cross-examined in respect to the type of discharge he obtained from the Marines and his conviction of the misdemeanor of petty larceny. The cross-examination complained of is as follows (Tr. 47-50):

"Q. Have you been in the Marines?

"A. Yes Sir.

"MR. OWEN: Just a moment—well, I don't know I'll withdraw that.

"THE COURT: I don't know what the objection was.

"MR. OWEN: Well, he asked him if he had been in the Marines.

"Q. When did you enter the Marines?

"A. It was in '72.

"Q. Could it be the 7th of July 1972?

"A. Somewhere around there.

"Q. And are you still in the Marines?

"A. No Sir.

"Q. Have you ever been discharged from the Marines?

"A. Technically, Yes, Sir.

"Q. Could you describe the discharge that you got?

"MR. OWEN: Now we're going to object to that, there's no point, that has no connection with this case, Your Honor. Oh, I'll withdraw my objection.

"THE COURT: You may answer the question.

"A. Have I been discharged?

"Q. Yes.

"A. An undesirable status.

"Q. What was the basis for that?

"MR. OWEN: Now Your Honor, we're going to object to exploring in depth.

"THE COURT: Overruled.

"Q. What was the basis for your discharge?

"A. The basis was U.A., unauthorized absence.

"THE COURT: I didn't understand that.

"A. Unauthorized absence.

"Q. Were you ever officially labeled as a deserter?

"A. Yes Sir.

"Q. Have you ever been convicted of a crime?

"MR. OWEN: Just a moment, we're going to object, that isn't a proper question, we've already let everything in that he wants to ask, it should be, 'Have you ever been convicted of a felony?'

"THE COURT: Overruled, you may answer the question.

"A. Yes Sir.

"Q. And what was the crime you were convicted of?

"MR. OWEN: Jost (sic) a moment! Your Honor, this is a misdemeanor, and I object to any further exploring along the lines, and I feel that a misdemeanor is an improper type, and is prejudicial and enflammatory to pursue a misdemeanor conviction.

"THE COURT: Overruled, you may answer the question.

"A. Yes Sir, I was convicted of Petty Larceny.

"Q. Do you recall . . . .

"MR. OWEN: Just a moment please? Will you come up, Mr. Richards?

"(Thereupon the following proceedings were had at the Bench and out of the hearing of the Jury).

"MR. OWEN: Comes now the Defendant and again moves for a mistrial for the reason that the District Attorney has been allowed to pursue his questioning of the crime of Petty Larceny, a misdemeanor, contrary to the rule of law which permits him to ask only of a felony conviction.

"THE COURT: What rule of law?

"MR. OWEN: It is my understanding that he can inquire only into prior felony convictions.

"THE COURT: Don't you think petty larceny involves moral turpitude?

"MR. OWEN: No Sir, not under these circumstances.

"THE COURT: Well, you have a right to make your record.

"MR. OWEN: We ask that this line of questioning be discontinued at this point, and further that the defendant has been prejudiced by inquiry as to his misdemeanor status, and unless there is proof produced of a felony conviction we ask that this questioning be terminated at this point, and we ask for a mistrial.

"THE COURT: Overruled. This witness, just like any other witness who takes the stand, puts his character on the line and he may be cross examined as to incidents in his life in checking on his credibility.

"MR. OWEN: Show our exception."

After a careful review of the record, and in particular the above quoted portion of the transcript, we cannot agree with defendant's contention. In addressing defendant's assertion that it was error to allow the prosecutor to ask questions concerning his discharge from the United States Marine Corps, it is appropriate to point out that the defendant answered questions up to and including the fact that he had received an undesirable discharge all of which questions were asked and answered without objection. In light of the evidence presented against the defendant and the fact that the jury assessed the minimum punishment allowed for this offense, it is difficult for us to see how the remaining questions dealing with the discharge prejudiced the defendant.

■ As to the assertion that it was error to allow the prosecutor to question the defendant in regard to his prior conviction for the crime of petty larceny, we need only point out that the applicable statute in effect at the time defendant was tried was 12 O.S.Supp.1973, § 381, which provided as follows:

"No person shall be disqualified as a witness in any civil action or proceeding, by reason of his interest in the event of the same, as a party or otherwise, or by reason of his conviction of a crime; but such interest may be shown for the purpose of affecting his credibility and conviction of a crime may be shown for the purpose of affecting his credibility if the crime was a felony or if the crime was a misdemeanor involving moral turpitude."

It has long been the rule in Oklahoma that the above statute is applicable to criminal cases. In *Eaton v. State,* Okl.Cr., 404 P.2d 50 (1965), this Court held in the third paragraph of the Syllabus that:

"When the defendant takes the witness stand the prosecution has the right to cross-examine him with the same latitude as any other witness. Under the statute he may be interrogated concerning his prior convictions for crime. (Title 12 O.S.A. § 381)"

As to the issue of whether the misdemeanor crime of petty larceny is one that involves moral turpitude, the Court in *Bartos v. United States District Court,* 19 F.2d 722 (8th Cir. 1927), addressed itself to the issue of moral turpitude saying:

". . . This is an old phrase in the law, and its meaning is demonstrated in cases in which a prior conviction is attempted to be proven for the purpose of impeaching a witness. It is subjective in meaning and restricted to those who commit the gravest offenses,—felonies, infamous crimes, those that are malum in se. They disclose the inherent character, that he is of depraved mind, and because thereof he is not worthy of belief even under oath. Crimes of a heinous nature have always been considered by laymen and lawyers alike as involving moral turpitude, regardless of legislative action on the subject. A thief is a debased man, he has no moral character. The fact that a statute may classify his acts as grand and petit larceny, and not punish the latter with imprisonment, and declare it to be only a misdemeanor, does not destroy the fact that theft, whether it be grand or petit larceny involves moral turpitude. It is malum in se, and so the consensus of opinion—statute or no statute—deduces from the commission of crimes malum in se the conclusion that the perpetrator is depraved in mind and is without moral character, because, forsooth, his very act involves moral turpitude. . . ." (at 724, citations omitted)

Accordingly, in light of the above discussion, we find these contentions to be without merit.

Finding no merit to the assignments of error presented, the judgment and sentence appealed from is, accordingly, *affirmed.*

BUSSEY and BLISS, JJ., concur.