Sahib AL–MOSAWI, Appellant,

v.

STATE of Oklahoma, Appellee.

F–94–433.

Court of Criminal Appeals of Oklahoma.

Nov. 21, 1996.

Rehearing Denied Jan. 24, 1997.

Barry Albert, Assistant Public Defender, Oklahoma City, for Appellant at trial.

Sandra Stensaas, Cassandra Williams, Assistant District Attorneys, Oklahoma City, for the State at trial.

Dora S. Roberts, Assistant Public Defender, Oklahoma City, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General, William L. Humes, Assistant Attorney General, Oklahoma City, for Appellee on appeal.

## *OPINION*

JOHNSON, Presiding Judge:

Sahib Al–Mosawi, hereinafter referred to as Appellant, was tried and convicted by jury for the crimes of Murder in the First Degree, malice aforethought, (Counts I and II) (21 O.S.1991, § 701.7), and Assault and Battery with a Deadly Weapon with Intent to Kill (Count III) (21 O.S.1991, § 652) in Case No. CF–92–7217 in the District Court of Oklahoma County before the Honorable Richard Freeman, District Judge. The jury found three aggravating circumstances as to each victim: (1) Appellant had knowingly created a great risk of death to more than one person; (2) Appellant was a continuing threat to society; and (3) the murders of Inaam Al–Nashi Al–Mosawi and Mohammed Al–Nashi were especially heinous, atrocious or cruel. The trial judge sentenced Appellant in accordance with the jury's recommendation of death on Counts I and II and twenty (20) years imprisonment on Count III. From these judgments and sentences, Appellant has perfected his appeal to this Court. We affirm.

State's witness, Fatima Al–Nashi, testified that in May of 1991, she, her uncle, Mohammed, and her sister, Inaam, met Appellant, his daughters Saher and Lamia, and his son, Wala, who had fled their homeland of Iraq. Both families spent nearly a year living in a refugee camp in Saudi Arabia. Soon thereafter, Mohammed married Saher and Appellant married Inaam. In July, 1992, both families received permission to come to the United States, where they settled in Oklahoma City. Dr. Fakrildeen Albahadily and his wife Zayneb Attia of Edmond, Oklahoma were the sponsor family.

Marital problems between Appellant and Inaam led Inaam, who was pregnant at the time, to move to her Uncle Mohammed's apartment located in the same complex as hers. On October 11, 1992, Inaam delivered a boy. According to the testimony of State's witness, Josephine "Dolly" Warden, Director of Oklahoma Refugee Resettlement Program, she notified Appellant of the birth. During Appellant's visit to the hospital, a dispute arose over the baby's name. Allegedly, Appellant and Inaam had agreed to name the baby after Appellant's father. However, Inaam did otherwise. The next day, Ms. Warden was called to the hospital at the insistence of a nurse. Upon her arrival, she saw Dr. Albahadily, Appellant and Oklahoma City Police Officer Karen Maule. (Witness Fatima testified that Appellant had threatened to kill Inaam and her family.) Ms. Warden visited with Appellant to explain that in the State of Oklahoma, it is the mother's right to name her baby.

Officer Maule testified that she responded to a disturbance call at Deaconess Hospital in Oklahoma City. When she arrived, she was taken to Inaam's room where Mohammed and Fatima, along with others, were present. Officer Maule testified that Inaam was in fear. Officer Maule then talked to security to determine a way to have Appellant leave the hospital. She suggested that they have the hospital secretary type up one of the little gift forms of a birth certificate with the name that Appellant demanded. Officer Maule was directed to a bench outside of the Emergency Room where Appellant was sitting. She inquired as to the name he wanted and escorted Appellant upstairs, where he wrote out the baby's name for the purpose of having it put on the "birth certificate." After receiving the "birth certificate," Appellant agreed to let Officer Maule drive him home.

As a result of the threats against her, Inaam, with the assistance of Ms. Warden and interpreter Faruk Necati, obtained a temporary Victim Protection Order (VPO) on November 12, 1992. The permanent Victim Protection Order was granted on November 20, 1992. Inaam was present with Ms. Warden and interpreter Father Adli Abraham. Appellant was also present. On November 21, 1992, Ms. Warden was called by Fatima and asked to come to Mohammed's apartment. When she arrived, Appellant, Inaam, Dr. Albahadily and his wife's cousin were present in the living room. Ms. Warden testified that she was very surprised and shocked to see Appellant there because of the VPO. She said she looked at Inaam and told her she (Inaam) should not be there because of the VPO. Inaam left the room. Thereupon, Dr. Albahadily became very angry with Ms. Warden, telling her that he had come to get the family back together and that she had ruined everything. When Ms. Warden tried to show Dr. Albahadily the VPO, he said angrily that it didn't mean anything and left with both Appellant and Inaam.

On November 28, 1992, Ms. Warden visited Mohammed's apartment for the purpose of having her daughter, who was home on Thanksgiving break, meet Inaam, her baby and Mohammed. (Her daughter had met Fatima on a previous occasion.) Also present at that time were Saher and Lamia. Ms. Warden and her daughter stayed for approximately one-half hour. At about 5:30 that evening, Ms. Warden retrieved her telephone messages. One was from a newly settled family of three brothers, the Necatis, who, a week earlier, had extended a dinner invitation to her for that evening. She returned the call and was asked to invite Mohammed and his family to dinner. Ms. Warden went to Mohammed's apartment to extend the invitation to Mohammed and Fatima. While there, Inaam asked her to come to the bedroom. Saher was on the bed and indicated that she was sick, but didn't know what was wrong. While Ms. Warden was in the bedroom, she saw Appellant come in carrying the baby. He came into the bedroom to show her the baby. As she was leaving, Ms. Warden advised Mohammed that maybe he should not go to the dinner because Saher was ill. She tried to persuade Fatima to come, but she declined. Ms. Warden left.

Approximately fifteen minutes later, Fatima arrived at Ms. Warden's apartment to say she had changed her mind about going to the dinner party. Fatima said she needed to change clothes, so Ms. Warden, showing her

on the clock what it meant, told her to be back by 6:45 p.m. Later, when Ms. Warden's daughter became anxious about the time getting late, Ms. Warden told her that she told Fatima to be there at 6:45. Ms. Warden's daughter said, "[b]ut it's 6:38." At that exact moment, there was a knock on the door. When Ms. Warden opened the door, Fatima was standing there shocked and bleeding and saying to her, "Inaam, Mohammed, Al–Mosawi (Appellant)", and pointed to her stomach. Ms. Warden interpreted Fatima to mean that Appellant had stabbed her, Mohammed and Inaam.

According to Fatima, Inaam asked Appellant if she could go to the dinner party. Appellant said she could not go and became angry. He left and went to his apartment to get Inaam's and the baby's clothes, with the intent of ending the relationship. When Appellant returned, he appeared upset and called Inaam and Fatima "street girls" and "bitches." Mohammed asked Appellant to leave. Appellant pulled a knife from his jacket and stabbed Mohammed in the chest. When Inaam attempted to help Mohammed, Appellant grabbed her and stabbed her in the stomach. Mohammed yelled for Fatima to help Inaam. Fatima, in the process of trying to get the knife from Appellant's hand, was stabbed in the stomach, hand and left side by Appellant. Fatima made her way from the apartment to Ms. Warden's apartment.

According to witness Mike Walker, who was in Pat McClemore's garage next to the apartment complex, they heard a lady screaming for help. They left the garage, went to the fence and looked over. He saw three people running up the alley, a woman and two men—one on each side of her. Mr. Walker went around the fence and observed the man on the woman's left hitting her about the head and shoulder. After the last blow, the woman fell. The two men continued running around the building out of his sight. While standing by Inaam's body waiting for help, Mr. Walker saw Appellant walking back towards them. Appellant had a jacket wrapped around his hand. When Appellant walked off, Mr. Walker followed him until he saw the police. Mr. Walker told the police the direction where Appellant was going. Mr. Walker could not tell if Appellant was the man on the left or right of Inaam.

Celena Walker testified that she was looking out her bedroom window when she saw a man, approximately five-six or five-seven in height, wearing a white button-downed shirt and dark pants. He was behind a woman with his left arm around her neck. The woman was struggling and screaming. Ms. Walker saw something "shiny" in his right hand. She saw him make a slicing motion around her neck area. The witness turned away from the window and when she looked back out, the woman was on the ground with the man standing over her. She saw a great deal of blood coming from the woman. Then the man walked off in a southerly direction.

Cheryl Walker, Celena Walker's mother, testified similarly to her daughter. She described the man as wearing dark brown slacks, dark brown jacket and white shirt. She went to Inaam and attempted to help her. She observed Appellant on two occasions after he walked away from Inaam. She described him as just wandering around, twice walking over to the victim, looking at her and walking back away. She noticed that he had something that looked like a knife in his hand which he had covered with his jacket.

Appellant testified that after he delivered Inaam's and the baby's clothes, Mohammed and Fatima confronted him with knives. When Mohammed tried to stab him, Inaam came between them and was stabbed in the stomach by Mohammed. Appellant said he never saw Fatima being stabbed because she was behind him. When Inaam ran outside of the apartment, he caught up with her and picked her up to carry her. When Inaam saw Mohammed behind them in pursuit, she told Appellant to put her down and run to save himself. Appellant put her down in an upright position. As he was running, he looked back and saw Mohammed holding Inaam from behind. Then he saw Inaam fall to the ground. Mohammed ran toward him, went back, looked at Inaam and then went to his car. Appellant was later arrested when he returned to his apartment.

Appellant admitted he was wearing a white shirt and jacket that evening. He denied having wrapped the jacket around his hand. He also testified that he was wearing jeans that evening.

Other facts will be discussed as they become relevant.

## I. PRETRIAL ISSUES

In his fifth, sixth and seventh propositions of error, Appellant raises questions about the admissibility of his statement during his custodial interrogation by police officers after his arrest. In his fifth proposition of error, Appellant specifically claims the trial court erred in denying his motion to suppress certain evidence because of *Allen*[1] violations. Appellant claims in his sixth proposition of error that his attempt to show the inadequacy of the *Miranda*[2] rights conveyed to him was futile because the trial court failed to allow him a proper *Jackson v. Denno*[3] hearing. In his seventh allegation of error, Appellant argues that he was not adequately advised of his *Miranda* rights because of his interpreter's inability to properly translate those warnings from English to Arabic.

■ We will begin by addressing Appellant's sixth assignment of error. There were two *Jackson v. Denno* hearings, the first of which was held on March 7, 1994, just prior to opening statements. At that time, Father Adli Abraham, who translated the *Miranda* warnings, was questioned by defense counsel and responded unequivocally that he translated each line of the warnings "word for word." The video tape of the interview was played and viewed by defense counsel, the prosecutors and the trial judge. (The trial judge also took the tape home to view.) The State made it known that they had transcribed the tape "word for word" and requested that said transcription be given to the jury to read along with the viewing of the video tape. Defense counsel objected, noting that the State had failed to turn over a copy of the transcription. Upon his request, defense counsel was given a copy.

■ At the second *Jackson v. Denno* hearing on March 28, 1994, defense counsel mounted a challenge to the adequacy of the *Miranda* warnings, claiming that the translation was not word for word, but a loose and very general translation. Appellant was allowed to testify at this hearing and was specifically questioned about his understanding of his rights. Thus, we find that Appellant was accorded a proper *Jackson v. Denno* hearing. Where there has been such a hearing, this Court will not disturb the ruling where the trial court's decision to admit a statement is supported by sufficient evidence that the statement was made voluntarily. *See Barnett v. State,* 853 P.2d 226, 231 (Okl. Cr.1993). Appellant's sixth proposition of error is without merit.

■ With regards to his seventh assignment of error, Appellant relies on our recent decision in *Valdez v. State,* 900 P.2d 363 (Okl.Cr.), *cert. denied,* —— U.S. ——, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995), wherein he claims the police went to "much greater lengths to advise that defendant," who at least spoke some English. In this case, Appellant spoke no English. While we find Father Abraham's translation of the *Miranda* rights and Appellant's responses were not "word for word," his interpretive translation sufficiently conveyed the *Miranda* rights and Appellant's responses. *Cf. California v. Prysock,* 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981). Appellant clearly responded that he understood he was entitled to a lawyer and that if he could not afford one, one would be provided. Although he was advised he had the right to refuse to answer any questions, Appellant insisted that he was willing and wanted to talk. In fact, he asked for a tape recorder because he was afraid he would forget something. After ascertaining that Appellant was not on medication and had no mental problems, Detective John Maddox asked Father Abraham to

**1.** *Allen v. District Court of Washington County,* 803 P.2d 1164 (Okl.Cr.1990).

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

inquire of Appellant about his side of what happened. Appellant gave a detailed statement. We find that Appellant was adequately advised of his *Miranda* rights. Appellant's seventh proposition of error is denied.

■ In his fifth proposition of error, Appellant claims that he was given a grossly incorrect translation of the video tape of his interrogation. Furthermore, when the defect was discovered by the prosecutor and a more accurate one was obtained, he alleges he was refused a copy in violation of *Allen.* At the hearing on his motion to suppress the transcription of the video tape interview, defense counsel acknowledged that he had his own personal copy of the video tape. He also acknowledged that, while the Oklahoma Supreme Court authorized the expenditure of $65.00 an hour for an interpreter, he realized that the interpreter's fees would exceed ten thousand dollars. Thus, he started searching for someone less expensive. He was able to engage Mr. Abraham Ahmad in February, 1994 to be his interpreter for "everything that I need done." However, he argued that because the State had made a transcription and intended to use it a trial, he was entitled to a copy, notwithstanding that he was in a position to do his own full transcription. Thus, he requested a mistrial.[4] The trial court denied the request. Defense counsel was given a copy of the full transcription, which the State intended to use with their last witness. Ultimately, the video tape was never admitted into evidence and was not viewed by the jury. Therefore, we find no error.

■ Appellant also itemizes four other alleged *Allen* violations:

1) 911 tape transcript;

2) failure to disclose in the summary of the witnesses that there were two eyewitnesses;

3) failure to disclose and provide a copy of a doctor's report of a bite mark[5]; and

4) State interview of the medical expert regarding his examination of Appellant, thereby breaching doctor-patient privilege.

However, Appellant fails to offer any specifics or support for the above with argument and authority. In order to support his contentions, Appellant must cite relevant and specific authority. *VanWoundenberg v. State,* 720 P.2d 328, 335 (Okl.Cr.), *cert. denied,* 479 U.S. 956, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986). Absent plain error, we will not address assertions unsupported by legal authority. *Kennedy v. State,* 640 P.2d 971, 980 (Okl.Cr.1982).

■ We review for plain error. The record reveals that at trial, Appellant objected to the 911 tape recording as hearsay and not an *Allen* violation. When a specific objection is made at trial, no different objection will be considered on appeal. *See Simpson v. State,* 876 P.2d 690, 703 (Okl.Cr.1994). Moreover, we note that defense counsel admitted that he had received a police transcript of the 911 call. We also note that the transcript contained eyewitness' statements describing the perpetrator. We further find that there was no doctor's report of a bite mark. Finally, as to the State's interview of the medical expert, we note that he was a defense witness whose report was furnished to the State by defense counsel. We find no plain error. This proposition is without merit.

## II. ISSUES RELATING TO JURY SELECTION

### A.

■ Appellant's first proposition of error claims he was denied a fair trial due to a prejudicial statement to a prospective juror by the court. The court stated he would "instruct you to return a guilty verdict" if the decision was reached that the State had, in fact, proven the guilt of Appellant. Upon objection by defense counsel, the trial judge corrected his statement by first telling the

---

4. This hearing was held on March 16, 1994, prior to the State's opening statement.

5. Appellant testified that no one bit him. He stated that the injury in question came when he attempted to shield himself from Fatima's attack with a knife.

jury that he had misstated the law and then he related the following:

> [I]f at the end of the trial you reach the conclusion that the defendant is guilty beyond a reasonable doubt to the—one or more of the counts, I will instruct you that if that is your decision, you must return a verdict of guilty.

Thus, we find that the trial judge's correction of his misstatement cured any error which may have resulted. *Clayton v. State,* 840 P.2d 18, 29 (Okl.Cr.1992), *cert. denied,* 507 U.S. 1008, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993). We find no merit to this assignment of error.

### B.

■■■■■ Second, Appellant complains that the trial court impermissibly defined reasonable doubt during voir dire. Specifically, Appellant complains about the following:

> THE COURT: And the amount of proof that it takes is beyond a reasonable doubt. Do you understand that, not beyond shadow of a doubt. You can still have some lingering doubts but they have to be reasonable doubts whatever that means, see.

Defense counsel objected and requested a new jury panel. This objection was overruled. Further, Appellant submits that error occurred when the trial court failed to give an instruction defining reasonable doubt.

This Court has long and consistently condemned the giving of an instruction as to the definition of the term "reasonable doubt" and held that the giving of same is error, subject to harmless error review. *Jones v. State,* 554 P.2d 830, 835 (Okl.Cr.1976). In *Templer v. State,* 494 P.2d 667, 671–2, (Okl.Cr.1972), we held the phrase "reasonable doubt" is self-explanatory and that definitions do not clarify its meaning, but rather tend to confuse the jury and should not be given. We held that this same logic should apply in attempts in voir dire examinations to explain to the jury what is meant by "reasonable doubt." In this case, we find error. However, we find the error harmless beyond a reasonable doubt under review of the entire record. Additionally, taken as a whole, the instructions are not constitutionally infirm.

Appellant asks this Court to reconsider its firmly established precedent condemning the giving of a definitional instruction on "reasonable doubt." He provides authority or guidance from thirty-one (31) states and the District of Columbia who do provide jurors with a definition of reasonable doubt. We decline Appellant's request. This argument was rejected in *Romano v. State,* 909 P.2d 92, 124–25 (Okl.Cr.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996). Thus, this proposition of error is denied.

### C.

Appellant's third proposition concerns eight alleged instances of mismanagement of prospective jurors which resulted in a violation of his right to a fair and impartial jury panel:

### 1.

■■■■ First, he claims that the trial judge excused five prospective jurors, *sua sponte,* without stating a reason, thus, negating his opportunity to inquire into the validity of the excusals. A review of the record reveals that three (3) of the jurors were dismissed because of illness or because of having a sick child. One (1) juror was dismissed due to his apparent negative attitude about the judicial system. The fifth juror who was excused had failed to show up the day before for jury duty. Thus, each dismissal had a sufficient basis. *Cf. Smith v. State,* 727 P.2d 1366, 1370 (Okl.Cr.1986), *cert. denied,* 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987). We find no merit here.

### 2.

■■■■ Second, Appellant complains that the prosecutor's statement that the District Attorney does not seek the death penalty in all Murder I cases was the functional equivalent of giving a personal opinion of his guilt. Defense counsel's objection to the comment was overruled for the reason that the trial court considered the comment an explanation that death penalty cases are different, rather than an expression of opinion as to Appellant's guilt. We agree. Further, any infer-

ence from the comment that it was an expression of Appellant's guilt is too obscure to be construed as to mean the same. *Cf. Moore v. State*, 672 P.2d 1175, 1178 (Okl.Cr. 1983). We find no merit to this claim.

### 3.

Appellant claims error after it was discovered that there were three separate episodes where prospective jurors were potentially exposed to discussions of this case. The trial court inquired as to each episode. An in camera hearing was held as to each episode. It was determined that only one episode concerned statements about the merits of the case.[6] The prospective juror who made the comments was dismissed. It was determined that the juror who heard the comments was not affected by them. A defendant must show actual prejudice from any jury misconduct. *Woodruff v. State*, 846 P.2d 1124, 1132 (Okl.Cr.), *cert. denied*, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993). Appellant has shown no actual prejudice here and we find no error.

### 4.

Appellant, without trial objection, complains about an incident in which a prospective juror had a conversation with his mother, who advised him to vote guilty. The trial court was informed about this conversation by two other prospective jurors. However, none of the three jurors involved was ever called to the jury box. Additionally, Appellant has not shown that the improper communications between the three prospective jurors were conveyed to any of the actual jurors. Thus, having failed to show prejudice, Appellant's claim of error is denied. *Id.*, at 1132.

### 5.

Next, Appellant complains that the trial court improperly diminished the jury's responsibility in returning the death penalty. During voir dire, the trial court admonished the jury not to talk about the case, explaining that any *improper conduct* on their part

could result in a reversal on appeal. Trial counsel objected to this explanation, arguing that the explanation conveyed to the jury that their *decision* would be examined in an appeal procedure, thus diminishing their responsibility in returning a death sentence. Appellant relies on *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). However, in *Caldwell*, the prosecutor told the jury in closing argument that their decision was automatically reviewable by the Supreme Court. The Supreme Court found this to be a clear violation of the Eighth Amendment. Here, this was only an admonition and therefore, no error.

### 6.

Appellant also urges this Court to find reversible error in the trial court's refusal to allow him to question each juror about the futility of the death penalty and whether life without parole is really lifetime incarceration. In *Duvall v. State*, 825 P.2d 621, 632 (Okl.Cr.1991), *cert. denied*, 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992), this Court held that "it is not relevant or proper to inquire as to whether or not a juror actually believes the penalty recommended will or will not be imposed." We find no error resulted from the exclusion of these questions.

### 7.

During individual voir dire on the death penalty, a prospective juror confided that two nights earlier, she and her husband had discussions about the death penalty and particular types of first degree murder. However, we find that this prospective juror was not chosen as a juror in this case. Thus, no prejudice or error could have resulted.

### 8.

In his eighth claim of jury misconduct, Appellant contends the trial court erred when it refused to dismiss for cause a prospective juror who believed that the death penalty was a solution for overcrowded prisons. The record shows that prospective ju-

---

**6.** Appellant acknowledges that the comments or conversations in the other two episodes were innocuous.

ror Honea was asked by defense counsel whether she had ever discussed the death penalty with her husband or other family members or friends. She responded that they have discussed overcrowding and "throwing them in there and they're not doing anything with them...." Defense counsel then asked her if she had read the article in yesterday's Sunday Oklahoman discussing a death penalty case. To which, she responded yes. However this juror was dismissed by defense counsel using his peremptory challenge. Appellant makes no claim that the use of this peremptory challenge prevented him from removing some other objectionable juror. We find no error.

### 9.

▮▮ Lastly, Appellant contends the trial court erred when it failed to grant his request for a mistrial after the prosecutor questioned a potential juror as to whether he would agree that the victims "are entitled for you all to hear what has happened to them in a fair light?" The defense attorney argued that this was a direct plea for sympathy for the victims. While the trial court overruled the motion for a mistrial, he admonished the prosecutor to refrain from the line of questioning.

Appellant cites *Jones v. State,* 738 P.2d 525, 529 (Okl.Cr.1987) as controlling. In *Jones,* we held it was error for the prosecutor to comment or otherwise ask jurors to consider a victim's "rights." However, such error is subject to harmless error analysis. In this case, we do not find that this comment determined the verdict. Thus, the error does not necessitate reversal. *See Simpson,* 876 P.2d at 702. This proposition of error is denied.

### III. FIRST STAGE ISSUES

### A.

In his fourth proposition of error, Appellant urges that he was denied due process when the trial court would not permit him to testify about the past relationships between the parties, while they were in Saudi Arabia. The proposed testimony contained hearsay statements. Defense counsel argued that the evidence was being offered to explain the declarants' states of mind and to show that Appellant was not the aggressor in this case. *See* 12 O.S.1991, § 2803(3). We have reviewed the instances in question and find that the hearsay sought to be admitted did not fall within the state of mind exception.

### B.

In his eighth proposition of error, Appellant challenges the admissibility of the in-court identifications. Appellant claims the identifications were irretrievably tainted and unreliable due to improper and suggestive pretrial identifications. Appellant points out that none of the witnesses were asked to identify Appellant either through a live line-up or photo line-up. Witness Michelle Brown was shown a single photo the day before trial. Witnesses Celena and Cheryl Walker observed Appellant, among others outside the courtroom, and based on their memory agreed that Appellant was the man they saw who attacked Inaam.

▮▮ Appellant relies on *Willis v. State,* 482 P.2d 623 (Okl.Cr.1971) to support his argument that Michelle Brown's in-court identification was tainted by a single photo shown to her the day before trial. We find *Willis* distinguishable. In this case, there was no failure by Ms. Brown to identify Appellant. She testified that she observed several people running in the area of her apartment and saw Appellant catch up with Inaam and begin to hit her on the side of her neck. She observed Appellant a second time, after he stabbed Inaam, as he stood directly under a light. Under the totality of the circumstances, we find Ms. Brown's in-court identification was reliable. *See Chatman v. State,* 716 P.2d 258, 259 (Okl.Cr.1986).

▮▮ Likewise, we find that the Walkers' in-court identifications were reliable under the totality of the circumstances. Both witnesses observed Appellant grab Inaam from behind as she ran from him and as he walked away from the scene. Cheryl Walker ran to Inaam and attempted to help her. She observed Appellant as he walked around the parking lot, come near Inaam on two occasions and then walk away. *See Cole v. State,*

766 P.2d 358, 359–60 (Okl.Cr.1988). We find the identifications proper.

### C.

■ In his ninth and twenty-second assignments of error, Appellant asserts that reversible error occurred when the trial court allowed the admission of post-mortem photographs of the victims and photographs of the crime scene. He contends that the photographs were gruesome and that their probative value was substantially outweighed by their prejudicial effect. We do not agree. Photographs which accurately depict the result of the defendant's actions or the condition of the deceased will not be inadmissible simply because they are gruesome. *Bryson v. State,* 876 P.2d 240, 258 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995). This proposition of error is denied.

### D.

In his tenth proposition of error, Appellant sets forth the following instances where he claims his Sixth Amendment right to confrontation was violated:

### 1.

During the cross-examination of Fatima, Appellant sought to elicit information concerning whether there were sexual indiscretions between Mohammed, Fatima and Inaam. Outside the presence of the jury, defense counsel made an offer of proof that a witness would testify that she witnessed Fatima and Mohammed engage in sexual intercourse. After argument of counsel, defense counsel admitted that the evidence was not relevant and did not pursue this line of questioning after the bench conference. Thus, Appellant's claims are not supported by the record and have been waived.

### 2.

During the cross-examination of Saher (Appellant's daughter and Mohammed's ex-wife), the interpreter asked to approach the bench. He was concerned whether Saher's response to defense counsel's question was proper. He related the response in English.

When defense counsel responded that the response was admissible, the prosecution objected. Defense counsel immediately withdrew his line of questioning. This claim is frivolous.

### 3.

During her cross-examination, Lamia (Appellant's daughter) responded that Mohammed told Appellant that he was taking Fatima and Inaam to use them for prostitution on the night of the incident. The State objected. The trial court overruled the objection. This claim is not supported by the record.

### 4.

■ During the cross-examination of the State's bite mark expert, defense counsel sought to elicit information regarding whose decision it was not to pursue evidence about a bite mark. Counsel moved for a mistrial. Counsel stated that the State had violated *Allen* when it did not provide him any information or report concerning bite mark evidence or any analytical report. The State responded that no analysis had been made, thus there was no report or analysis to turn over. Moreover, defense counsel acknowledged that the State did provide him a copy of Detective Maddox's report. This report contained information that bite marks were photographed, that bite mark impressions were made and indicated where such evidence was kept. Defense counsel then resumed his cross-examination of Detective Maddox and asked why a bite mark analysis was not pursued. Detective Maddox responded that it was not his decision to make. When defense counsel asked, "[d]id someone within the District Attorney's office tell you not to pursue the bite mark with Dr. Glass?", the question was met with the response, "Asked and answered." The trial court sustained the objection.

Defense counsel insisted that he should be allowed to establish that someone in the D.A.'s office instructed Detective Maddox not to pursue the bite mark analysis. Counsel made an offer of proof, which consisted of the questions he would ask and the anticipated answers. Counsel believed the evidence

would reveal the name of the person in the D.A.'s office who allegedly told Detective Maddox not to pursue the bite mark analysis. The trial judge ruled defense counsel's offer was based on supposition rather than actual knowledge by defense counsel.

When determining whether such a restriction on testimony is error, this Court, pursuant to *Delaware v. Van Arsdall,* 475 U.S. 673, 684–85, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986), considers the following factors to determine whether the restriction constituted harmless error:

1. the importance of the witness' testimony in the prosecution's case;

2. whether the testimony was cumulative;

3. the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points;

4. the extent of cross-examination otherwise permitted; and finally,

5. the overall strength of the prosecution's case.

*Wing v. State,* 727 P.2d 1383, 1385 (Okl.Cr. 1986).

Applying these factors to this case, we find that the bite mark evidence, had it been pursued, was not crucial to the prosecution's case. We note that Appellant testified that no one bit him, but that the injury in question came when he attempted to shield himself from Fatima's attack with a knife. This proposition is without merit.

### E.

Appellant next sought to elicit testimony from Fatima about sexual relationships between Mohammed and his nieces, Fatima and Inaam, and about taking his nieces to the home of single men for sexual purposes. Appellant claims that this information was relevant to prove his state of mind during and before the fight.

Defense counsel was allowed to question whether the intent of going to the party was for the purpose of sexual activity. In fact, defense counsel voluntarily withdrew the question, stating that he would "come back to it at a later time if I lay a better foundation, and you can rule on it at that time." Defense counsel failed to resume the line of questioning. In light of the foregoing, this proposition is meritless.

### F.

In his eleventh proposition of error, Appellant contends that error occurred when the trial court failed to give his requested instructions on self-defense and lesser degrees of homicide. He further contends that the trial court should have voir dired the jury on the respective elements of same. It is well established that where the evidence does not reasonably support a conviction on the lesser included offense(s) or where the evidence provides no support for the defendant's theory of the case, then the instructions should not be given. *See Hooker v. State,* 887 P.2d 1351, 1361 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995). In this case, Appellant's defense was that he committed no crime at all. Therefore, he was not entitled to the requested instructions. This proposition of error fails.

### G.

Twelfth, Appellant claims that his conviction must be reversed because the trial court allowed evidence of other crimes and bad acts committed by Appellant, but did not allow the same type of evidence with respect to the victims. However, Appellant fails to offer any specific examples to support his claim with respect to the victims. Specifically, he complains about the testimony of Hadi Taklif, who testified that Inaam expressed to him that she was afraid of Appellant because of prior threats he made against her. While the challenged evidence was technically hearsay, we find that it was admissible under the state of mind exception to the hearsay rule set forth in 12 O.S.1991, § 2803(3). *See Duvall,* 825 P.2d at 626. This proposition fails.

### H.

In his thirteenth proposition of error, Appellant complains of two instances in which improper hearsay was admitted. First, he complains that the admission of a 911 audiotape was hearsay and served to

bolster the testimony of witness Michelle Brown. Brown made the 911 call. The tape was properly admitted under the "business records" exception to the hearsay rule. *See* 12 O.S.1991, § 2803(6).

The tape may have been cumulative. However, this alone does not amount to reversible error. The admission of evidence which is merely cumulative may not be held reversible error even though the evidence was inadmissible. *See Shelton v. State*, 546 P.2d 1348, 1351 (Okl.Cr.1976); *Schneider v. State*, 538 P.2d 1088, 1096 (Okl.Cr.1975); *Constabile v. State*, 513 P.2d 588, 590 (Okl. Cr.1973).

Appellant also complains about the tape's submission to the jury during deliberations. We find that the tape did not constitute testimony of a witness, but was admissible as an exhibit. *See Duvall v. State*, 780 P.2d 1178, 1180 (Okl.Cr.1989) and *Martin v. State*, 747 P.2d 316, 319–20 (Okl.Cr.1987).

Second, Appellant complains about the hearsay testimony of Dolly Warden. In response to questioning regarding why she visited Inaam at the hospital, Warden stated that a nurse called her and insisted that she come immediately because Sahib was threatening to kill Inaam and her family. The trial court sustained defense counsel's objection and admonished the jury to disregard the testimony. A trial court's admonition to the jury to disregard the remarks of counsel or a witness usually cures any error unless it is of such nature, after considering the evidence, that the error appears to have determined the verdict. *See Price v. State*, 546 P.2d 632, 636 (Okl.Cr.1976). We do not find that the remark was outcome determinative. Additionally, we do not find the response was hearsay. This proposition of error is denied.

## I.

Appellant next alleges that he was prejudiced by an evidentiary harpoon during Officer Maule's testimony. In response to questioning about what she did after arriving at the hospital, Officer Maule replied that she went to security and "[t]hey took us to the second floor where he advised that he had a

subject who had threatened a patient there at the hospital." Defense counsel's objection was sustained and the jury was admonished to disregard the statement. A trial court's admonition to the jury to disregard the remarks of counsel or a witness usually cures an error unless it is of such nature, after considering the evidence, that the error appears to have determined the verdict. We do not find that the remark was outcome determinative. *See Price*, 546 P.2d at 636. This proposition of error is denied.

## J.

In his fifteenth assignment of error, Appellant contends that the trial court erred by improperly allowing the testimony of Sue Dennis. Sue Dennis was the bailiff who was present at the hearing on Inaam's Application for a Victim Protection Order against Appellant. Where one spouse commits a crime against the other spouse, evidence of protective orders issued against the offending spouse may be admissible to show motive, malice or intent, where intent is an issue. *Rowland v. State*, 817 P.2d 263, 267 (Okl.Cr.1991). Here evidence of the protective order was admissible to establish intent and motive. We find no error.

## K.

Appellant next asks this Court to reverse his conviction because the trial judge improperly became an advocate for the State. Appellant objects to two specific comments that implied that the trial judge did not believe Appellant. We have reviewed the pertinent portions of the record and do not find that the comments amounted to bolstering or opinions as to Appellant's credibility. So long as a trial judge does not indicate to the jury his views of the issues in contention, he possesses considerable latitude in the conduct of the trial. *See Brown v. State*, 506 P.2d 1396, 1399 (Okl.Cr.1973). We find no merit in this proposition.

## IV. SECOND STAGE ISSUES

### A.

In his seventeenth assignment of error, Appellant asserts that the admission of

victim impact evidence, in general, and the following photographs, offered through Fatima, as victim impact evidence without an "evidentiary balancing" prior to their admission violated his constitutional rights:

1. Enlarged color photo of Inaam and her son with Fatima. [Fatima testified the picture was taken in her apartment when the baby was twenty days old.]

2. Enlarged color photo of Mohammed, "smiling broadly." [Fatima testified that the picture was taken by Ms. Warden on the day Mohammed went to tell her how happy he was because he had just gotten his driver's license.]

Appellant points out that as soon as Fatima saw the photos, she sobbed and cried uncontrollably and continued to do so during the bench conference dealing with defense counsel's objection. The trial court overruled defense counsel's objection, saying, "[t]his whole procedure, the second stage, is nothing but a controlled prejudicial presentation. That's the whole thing. The State is trying to show this jury that the maximum punishment should be inflicted." Thus, the photos were admitted into evidence.

Appellant challenges the propriety of admitting, for the purpose of "Victim Impact," photos of the victims while they were alive. This Court recently addressed this issue, as well as the admission of victim impact evidence in general, in *Cargle v. State,* 909 P.2d 806, 824–30, 835 (Okl.Cr.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996). We held that such photographs are generally inadmissible, based on their relevancy to the issues presented at trial. Here, the photographs did not demonstrate any information about the victims, did not show how their deaths affected or might have affected the survivors and in no way showed the financial, psychological or physical impact on their survivors. Accordingly, it was error to admit the photographs. *Id.* at 830.

Inasmuch as this error was a trial error, it may therefore be assessed in the context of other evidence presented during the second stage in order to determine whether its admission was harmless beyond a reasonable doubt. *Id.* at 835. Since we have deter-

mined, independent of the victim impact evidence, that there was sufficient evidence to support the three aggravating circumstances found in each murder and that evidence outweighed the mitigating evidence presented, we hold the error was harmless beyond a reasonable doubt. This proposition of error is denied.

### B.

In his eighteenth proposition of error, Appellant challenges Oklahoma's application of the "great risk of death to more than one person" aggravator as being illogical, arbitrary, standardless and unconstitutional. The constitutionality of this aggravator was determined in *Cartwright v. Maynard,* 802 F.2d 1203, 1221–22 (10th Cir.1986), *reversed on other grounds,* 822 F.2d 1477 (1987), *aff'd, Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). This proposition is without merit.

### C.

Since Appellant's nineteenth and twentieth assignments of error concern the "especially heinous, atrocious, or cruel" aggravator, they will be considered together. Appellant asserts that the instruction fails to channel the sentencer's discretion because it does not require the sentencer to find as an absolute prerequisite that the death was in fact preceded by torture or serious physical abuse. This argument was addressed in *Romano,* 909 P.2d at 121, and rejected.

Second, Appellant complains that the verdict form for the aggravators was flawed because it failed to set out the limiting language—the death is preceded by torture or serious physical abuse. We also addressed this issue in *Romano,* 909 P.2d at 125, and held that "where terms or crimes are defined in one instruction and used in other instructions this is sufficient." This proposition is without merit.

### D.

In his twenty-first assignment of error, Appellant challenges as unconstitutionally vague and overbroad, Oklahoma's application

of the continuing threat aggravator. Relying on *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), Appellant argues that the instructions do not serve to narrow the jury's discretion by any objective criteria. This argument is well settled by *stare decisis. See Malone v. State*, 876 P.2d 707, 717–18 (Okl.Cr.1994) and cases cited therein. As Appellant has given us no persuasive reason to change this rule of law, this proposition is without merit.

### E.

In his twenty-third assignment of error, Appellant states that the jury instructions improperly misled the jury to believe that they must unanimously find mitigating circumstances. In support of this contention, Appellant points out: (1) the instructions on mitigating circumstances were wedged between instructions on aggravating circumstances; (2) the instructions on aggravating circumstances made numerous and repeated references to the need for unanimity and (3) the instructions failed to specifically explain that mitigating circumstances did not have to be found unanimously. This argument was addressed and rejected in *Stiles v. State*, 829 P.2d 984, 997 (Okl.Cr.1992). We need not address it again here.

### F.

In his twenty-fourth proposition of error, Appellant claims that the trial court's instructions set forth an improper burden of proof regarding the manner in which the jury was to weigh aggravating factors against mitigating circumstances. Appellant asserts that the requirement that a jury need only find that the evidence in aggravation outweighs the evidence in mitigation before imposing the death penalty sets a standard which directly contravenes the heightened need for reliability in death penalty cases. Rather, Appellant asks this Court to adopt a "reasonable doubt" standard, i.e., that evidence in aggravation outweighs beyond a reasonable doubt the evidence in mitigation. He cites authority from several states which have adopted this standard. However, this specific allegation was addressed in *Romano v. State*, 847 P.2d 368, 392 (Okl.Cr.1993),

*aff'd.*, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994), and rejected.

■ Appellant further contends that the trial court failed to instruct the jury that each of the convictions were to be considered separately in determining the sentences. We first note that Appellant cites no authority. In fact, he fails to develop it beyond the bald assertion. Second, the jury was given a separate "Verdict Form For Aggravating Circumstances" and a separate "Death Verdict Form" for Count I and Count II. Thus, his sentencing was individualized for each victim, negating a need for such an instruction, which was not requested. This proposition is without merit.

### G.

■ In his twenty-fifth assignment of error, Appellant asserts that his constitutional rights were violated because the jury instructions on the issue of mitigation permitted jurors to ignore mitigating evidence altogether. The challenged instruction reads as follows:

> Mitigating circumstances are those which, in fairness and mercy, *may* be considered as extenuating or reducing the degree of moral culpability or blame. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case. (Emphasis added.)

This instruction is OUJI–CR–438, which merely instructs the jury on how to determine mitigating circumstances. It in no way instructed the jury that "it had the discretion to decide if the mitigating circumstances applied to the facts of this case" or that it may ignore mitigating evidence altogether. This proposition fails.

### H.

Appellant urges in his twenty-sixth proposition of error that his death sentences should be invalidated because the trial court failed to instruct the jury on the "cardinal principle" of presumption of life. This argument has been raised and rejected by this Court. *See Trice v. State*, 853 P.2d 203, 215–16 (Okl.Cr.), *cert. denied*, 510 U.S. 1025, 114

S.Ct. 638, 126 L.Ed.2d 597 (1993); *Duvall,* 825 P.2d at 634. This proposition of error is denied.

### I.

 In his twenty-seventh proposition of error, Appellant assigns as error the trial court's refusal to allow testimony concerning the cost effectiveness of the death penalty. Appellant filed a pre-trial motion to allow evidence on the cost effectiveness of the death penalty.

This Court has construed the language of 21 O.S.1991, § 701.10(C) to mean "that a defendant may present any relevant evidence, within limitations of the rules of evidence, bearing on his character, prior record or the circumstances of the offense." *See Chaney v. State,* 612 P.2d 269, 279–80 (Okl. Cr.1980), *cert. denied,* 450 U.S. 1025, 101 S.Ct. 1731, 68 L.Ed.2d 219 (1981). Evidence of cost effectiveness of the death sentence does not bear on a defendant's character, prior record or the circumstances of the offense. We deny this assignment of error.

### J.

In his twenty-eighth proposition of error, Appellant claims the trial court's first stage instruction improperly engendered sympathy for the victim thereby denying him his constitutional right to full and fair consideration by the jury of his mitigating evidence. Appellant argues that in the first stage instructions, which were incorporated into the second stage instructions, the jury was told not to allow sympathy, sentiment or prejudice to enter into its deliberations.

We addressed this issue in *Bryson,* 876 P.2d at 260 and more recently in *Romano,* 909 P.2d at 120–21. We find no error.

### K.

 Last, Appellant asserts that his constitutional rights were violated by the trial court's refusal to instruct the jury that it had the option to return a verdict of life in prison without the possibility of parole regardless of its finding of aggravating and mitigating circumstances. Appellant cites several authorities from other jurisdictions. However, we do not find them to be persuasive. Such an instruction is not required in Oklahoma. *See Bryson,* 876 P.2d at 262–63; *Pickens v. State,* 850 P.2d 328, 339 (Okl.Cr.1993), *cert. denied,* 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994).

### MANDATORY SENTENCE REVIEW

 Finally, pursuant to 21 O.S.1991, § 701.13(C), this Court is charged to determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; (2) whether the evidence supports the jury's finding of the statutory aggravating circumstances found. We are satisfied that neither passion, prejudice or any other arbitrary factor is present in the record to undermine our confidence in the jury's verdict. Ample evidence supports the jury's finding of three (3) aggravating factors:

1. That Appellant had knowingly created a great risk of death to more than one person.

2. That Appellant was a continuing threat to society; and

3. That the murders of Inaam Al–Nashi Al–Mosawi and Mohammed Al–Nashi were especially heinous, atrocious and cruel.

In mitigation, Appellant presented the testimony of family members, Shaer, Lamia and Wala who asked that their father's life be spared. Additionally, Appellant presented the testimony of Dr. Haisim Al–Khouri, a second year medical resident in Psychiatry at the Oklahoma Health Sciences Center. Dr. Al–Khouri testified that he examined Appellant and, while not having been confirmed by testing, believed he may have moderate mental depression stemming from family conflict and his cultural and language barrier.

After carefully weighing the aggravating circumstances and all the mitigating circumstances, we find the aggravating circumstances far outweigh the mitigating evidence and that the sentence of death is factually substantiated and appropriate. Finally, no error exists warranting reversal or modifica-

tion. The judgments and sentences are AFFIRMED.

CHAPEL, V.P.J., and STRUBHAR, J., concur in result.

LUMPKIN and LANE, JJ., concur.