**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 29 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SAHIB LATEEF AL-MOSAWI,

 Petitioner-Appellant,

v.

GARY L. GIBSON, Warden,
Oklahoma State Penitentiary,

 Respondent-Appellee.

No. 00-6020

(D.C. No. 98-CV-1288)
(W.D. Okla.)

**ORDER AND JUDGMENT** *

Before **BRORBY** , **EBEL** , and **BRISCOE** , Circuit Judges .

   Petitioner Sahib Al-Mosawi, an Oklahoma prisoner facing two death

sentences for the first degree murders of his wife and her uncle, and an additional

twenty-year sentence for assault and battery on his wife's sister, appeals the

district court's denial of his 28 U.S.C. § 2254 petition for writ of habeas corpus.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

---

   * This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

I.

Approximately two months after arriving in Oklahoma City from a refugee camp in Saudi Arabia, petitioner violently stabbed his wife Inaam, her uncle Mohammad, and her sister Fatima. Only Fatima survived. Although the precise motive is unclear, it appears the attacks were the culmination of petitioner's stormy relationships with Inaam and Mohammad. The evidence presented at trial indicated that petitioner routinely threatened and abused his wife and falsely accused her of engaging in adulterous behavior. Further, the evidence indicated that petitioner had previously threatened to harm or kill Mohammad.[1]

To provide additional detail, we include the following summary of facts as recounted by the Oklahoma Court of Criminal Appeals (OCCA) in disposing of petitioner's direct appeal:

> State's witness, Fatima Al-Nashi, testified that in May of 1991, she, her uncle, Mohammed, and her sister, Inaam, met Appellant, his daughters Saher and Lamia, and his son, Wala, who had fled their homeland of Iraq. Both families spent nearly a year living in a refugee camp in Saudi Arabia. Soon thereafter, Mohammed married Saher and Appellant married Inaam. In July, 1992, both families received permission to come to the United States, where they settled in Oklahoma City. Dr. Fakrildeen Albahadily and his wife Zayneb Attia of Edmond, Oklahoma were the sponsor family.
> Marital problems between Appellant and Inaam led Inaam, who was pregnant at the time, to move to her Uncle Mohammed's

---

[1] The Oklahoma Court of Criminal Appeals spelled the name "Mohammed." However, the trial transcript consistently referred to him as "Mohammad."

2

apartment located in the same complex as hers. On October 11, 1992, Inaam delivered a boy. According to the testimony of State's witness, Josephine "Dolly" Warden, Director of Oklahoma Refugee Resettlement Program, she notified Appellant of the birth. During Appellant's visit to the hospital, a dispute arose over the baby's name. Allegedly, Appellant and Inaam had agreed to name the baby after Appellant's father. However, Inaam did otherwise. The next day, Ms. Warden was called to the hospital at the insistence of a nurse. Upon her arrival, she saw Dr. Albahadily, Appellant and Oklahoma City Police Officer Karen Maule. (Witness Fatima testified that Appellant had threatened to kill Inaam and her family.) Ms. Warden visited with Appellant to explain that in the State of Oklahoma, it is the mother's right to name her baby.

Officer Maule testified that she responded to a disturbance call at Deaconess Hospital in Oklahoma City. When she arrived, she was taken to Inaam's room where Mohammed and Fatima, along with others, were present. Officer Maule testified that Inaam was in fear. Officer Maule then talked to security to determine a way to have Appellant leave the hospital. She suggested that they have the hospital secretary type up one of the little gift forms of a birth certificate with the name that Appellant demanded. Officer Maule was directed to a bench outside of the Emergency Room where Appellant was sitting. She inquired as to the name he wanted and escorted Appellant upstairs, where he wrote out the baby's name for the purpose of having it put on the "birth certificate." After receiving the "birth certificate," Appellant agreed to let Officer Maule drive him home.

As a result of the threats against her, Inaam, with the assistance of Ms. Warden and interpreter Faruk Necati, obtained a temporary Victim Protection Order (VPO) on November 12, 1992. The permanent Victim Protection Order was granted on November 20, 1992. Inaam was present with Ms. Warden and interpreter Father Adli Abraham. Appellant was also present. On November 21, 1992, Ms. Warden was called by Fatima and asked to come to Mohammed's apartment. When she arrived, Appellant, Inaam, Dr. Albahadily and his wife's cousin were present in the living room. Ms. Warden testified that she was very surprised and shocked to see Appellant there because of the VPO. She said she looked at Inaam and told her she (Inaam) should not be there because of the VPO. Inaam left the room. Thereupon, Dr. Albahadily became very angry with Ms.

3

Warden, telling her that he had come to get the family back together and that she had ruined everything. When Ms. Warden tried to show Dr. Albahadily the VPO, he said angrily that it didn't mean anything and left with both Appellant and Inaam.

On November 28, 1992, Ms. Warden visited Mohammed's apartment for the purpose of having her daughter, who was home on Thanksgiving break, meet Inaam, her baby and Mohammed. (Her daughter had met Fatima on a previous occasion.) Also present at that time were Saher and Lamia. Ms. Warden and her daughter stayed for approximately one-half hour. At about 5:30 that evening, Ms. Warden retrieved her telephone messages. One was from a newly settled family of three brothers, the Necatis, who, a week earlier, had extended a dinner invitation to her for that evening. She returned the call and was asked to invite Mohammed and his family to dinner. Ms. Warden went to Mohammed's apartment to extend the invitation to Mohammed and Fatima. While there, Inaam asked her to come to the bedroom. Saher was on the bed and indicated that she was sick, but didn't know what was wrong. While Ms. Warden was in the bedroom, she saw Appellant come in carrying the baby. He came into the bedroom to show her the baby. As she was leaving, Ms. Warden advised Mohammed that maybe he should not go to the dinner because Saher was ill. She tried to persuade Fatima to come, but she declined. Ms. Warden left.

Approximately fifteen minutes later, Fatima arrived at Ms. Warden's apartment to say she had changed her mind about going to the dinner party. Fatima said she needed to change clothes, so Ms. Warden, showing her on the clock what it meant, told her to be back by 6:45 p.m. Later, when Ms. Warden's daughter became anxious about the time getting late, Ms. Warden told her that she told Fatima to be there at 6:45. Ms. Warden's daughter said, "[b]ut it's 6:38." At that exact moment, there was a knock on the door. When Ms. Warden opened the door, Fatima was standing there shocked and bleeding and saying to her, "Inaam, Mohammed, Al-Mosawi (Appellant)", and pointed to her stomach. Ms. Warden interpreted Fatima to mean that Appellant had stabbed her, Mohammed and Inaam.

According to Fatima, Inaam asked Appellant if she could go to the dinner party. Appellant said she could not go and became angry. He left and went to his apartment to get Inaam's and the baby's clothes, with the intent of ending the relationship. When Appellant

4

returned, he appeared upset and called Inaam and Fatima "street girls" and "bitches." Mohammed asked Appellant to leave. Appellant pulled a knife from his jacket and stabbed Mohammed in the chest. When Inaam attempted to help Mohammed, Appellant grabbed her and stabbed her in the stomach. Mohammed yelled for Fatima to help Inaam. Fatima, in the process of trying to get the knife from Appellant's hand, was stabbed in the stomach, hand and left side by Appellant. Fatima made her way from the apartment to Ms. Warden's apartment.

According to witness Mike Walker, who was in Pat McClemore's garage next to the apartment complex, they heard a lady screaming for help. They left the garage, went to the fence and looked over. He saw three people running up the alley, a woman and two men--one on each side of her. Mr. Walker went around the fence and observed the man on the woman's left hitting her about the head and shoulder. After the last blow, the woman fell. The two men continued running around the building out of his sight. While standing by Inaam's body waiting for help, Mr. Walker saw Appellant walking back towards them. Appellant had a jacket wrapped around his hand. When Appellant walked off, Mr. Walker followed him until he saw the police. Mr. Walker told the police the direction where Appellant was going. Mr. Walker could not tell if Appellant was the man on the left or right of Inaam.

Celena Walker testified that she was looking out her bedroom window when she saw a man, approximately five-six or five-seven in height, wearing a white button-downed shirt and dark pants. He was behind a woman with his left arm around her neck. The woman was struggling and screaming. Ms. Walker saw something "shiny" in his right hand. She saw him make a slicing motion around her neck area. The witness turned away from the window and when she looked back out, the woman was on the ground with the man standing over her. She saw a great deal of blood coming from the woman. Then the man walked off in a southerly direction.

Cheryl Walker, Celena Walker's mother, testified similarly to her daughter. She described the man as wearing dark brown slacks, dark brown jacket and white shirt. She went to Inaam and attempted to help her. She observed Appellant on two occasions after he walked away from Inaam. She described him as just wandering around, twice walking over to the victim, looking at her and walking back away. She noticed that he had something that looked like a

knife in his hand which he had covered with his jacket.

Appellant testified that after he delivered Inaam's and the baby's clothes, Mohammed and Fatima confronted him with knives. When Mohammed tried to stab him, Inaam came between them and was stabbed in the stomach by Mohammed. Appellant said he never saw Fatima being stabbed because she was behind him. When Inaam ran outside of the apartment, he caught up with her and picked her up to carry her. When Inaam saw Mohammed behind them in pursuit, she told Appellant to put her down and run to save himself. Appellant put her down in an upright position. As he was running, he looked back and saw Mohammed holding Inaam from behind. Then he saw Inaam fall to the ground. Mohammed ran toward him, went back, looked at Inaam and then went to his car. Appellant was later arrested when he returned to his apartment.

Appellant admitted he was wearing a white shirt and jacket that evening. He denied having wrapped the jacket around his hand. He also testified that he was wearing jeans that evening.

Al-Mosawi v. State, 929 P.2d 270, 274-77 (Okla. Crim. App. 1996) ("Al-Mosawi I").

Petitioner was charged by information in the District Court of Oklahoma County with two counts of first degree malice murder (for the deaths of his wife Inaam and her uncle Mohammad) and one count of assault and battery with a deadly weapon with intent to kill (for the assault on his wife's sister Fatima). The State filed a bill of particulars alleging three aggravating circumstances: (1) petitioner knowingly created a great risk of death to more than one person; (2) the murders were especially heinous, atrocious or cruel; and (3) existence of a probability that petitioner would commit criminal acts of violence in the future that would constitute a continuing threat to society. The case was tried to a jury

in March and April of 1994. At the conclusion of the first phase, the jury found petitioner guilty of all charges. At the conclusion of the second phase, the jury found the existence of all three aggravating circumstances alleged by the prosecution. Based upon these findings, the jury fixed petitioner's punishment at death on both of the first degree murder counts, and imposed a twenty-year sentence for the assault and battery count. The trial court formally sentenced petitioner on April 15, 1994.

Petitioner filed a direct appeal asserting twenty-nine grounds for relief. The OCCA affirmed the convictions and sentences. Al-Mosawi I, 929 P.2d at 288. The Supreme Court denied certiorari review. Al-Mosawi v. Oklahoma, 522 U.S. 852 (1997). Petitioner subsequently filed an application for post-conviction relief with the OCCA, asserting eleven grounds for relief. The OCCA rejected petitioner's request for an evidentiary hearing and denied relief. Al-Mosawi v. State, 956 P.2d 906, 911 (Okla. Crim. App. 1998).

Petitioner initiated this federal habeas proceeding by filing motions to proceed in forma pauperis and for appointment of counsel. The district court granted petitioner's motion for appointment of counsel and counsel filed a petition for writ of habeas corpus. The district court denied the request for habeas relief. Petitioner filed a timely notice of appeal and a request for a certificate of appealability (COA) with respect to all of the issues originally

7

asserted in his habeas petition. The district court denied petitioner's request for a COA. Pursuant to a renewed application for COA, this court granted petitioner a COA with respect to three issues: (1) whether he was deprived of his Sixth Amendment confrontational rights by the admission of certain hearsay testimony; (2) whether he received adequate representation by trial counsel; and (3) whether he received adequate representation by appellate counsel.

## II.

Because petitioner's federal habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), it is governed by the provisions of the AEDPA. Wallace v. Ward, 191 F.3d 1235, 1240 (10th Cir. 1999), cert. denied, 120 S. Ct. 2222 (2000). Under the AEDPA, the appropriate standard of review for a particular claim hinges on the treatment of that claim by the state courts. If a claim was not decided on the merits by the state courts and is not otherwise procedurally barred, we may exercise our independent judgment in deciding the claim. See LaFevers v. Gibson, 182 F.3d 705, 711 (10th Cir. 1999). In doing so, we review the federal district court's conclusions of law de novo and its findings of fact, if any, for clear error. Id. If a claim was adjudicated on its merits by the state courts, the petitioner will be entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly

8

established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2). "Thus, we may grant the writ if we find the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law; decided the case differently than the Supreme Court has on a set of materially indistinguishable facts; or unreasonably applied the governing legal principle to the facts of the prisoner's case." Van Woudenberg v. Gibson, 211 F.3d 560, 566 (10th Cir. 2000) (citing Williams v. Taylor, 120 S. Ct. 1495, 1523 (2000)).

*Admission of hearsay evidence*

Petitioner contends the trial court violated his Sixth Amendment confrontation rights by improperly admitting hearsay testimony from prosecution witnesses Sue Dennis and Adli Abraham. During its case-in-chief, the prosecution presented evidence that, approximately eight days prior to the murders, petitioner's wife Inaam sought and obtained from an Oklahoma state court a victim protection order (VPO) prohibiting petitioner from having contact with her or their infant son. Dennis, a court bailiff who was present during the hearing on Inaam's application for a VPO, testified that Inaam informed the presiding judge she was afraid of petitioner. Dennis further testified that Inaam

9

told the presiding judge in English: "He [petitioner] hurts me." Tr. Vol. 16 at 157. When asked to describe Inaam's demeanor during the proceedings, Dennis testified: "In my opinion she was scared to death." Id. at 158. Abraham, the individual who acted as interpreter for both Inaam and petitioner at the hearing, testified that Inaam had with her at the hearing a written list of fourteen things petitioner had allegedly done to her that led her to seek a VPO. Over petitioner's objection, the trial court allowed Abraham to read from this list. Abraham testified that the list indicated petitioner (1) accused Inaam of being an adulteress; (2) threatened to kill Inaam on more than one-hundred occasions; (3) frequently cursed Inaam; and (3) visited the hospital shortly after Inaam gave birth to their infant son and threatened to kill Inaam and the baby if she did not agree to live with him (rather than living with her uncle Mohammad).

"The Sixth Amendment's Confrontation Clause, made applicable to the States through the Fourteenth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" Ohio v. Roberts, 448 U.S. 56, 62-63 (1980). "While the Confrontation Clause does not bar the admission of all hearsay, it 'reflects a preference for face-to-face confrontation at trial.'" Paxton v. Ward, 199 F.3d 1197, 1207 (10th Cir. 1999) (quoting Roberts, 448 U.S. at 63). "The Supreme Court has struck a balance between the need to protect the integrity of the fact-finding process

10

through cross-examination and the needs of effective law enforcement . . . by holding that admission of a hearsay statement does not violate the Confrontation Clause if it bears adequate indicia of reliability." Id. at 1207 (internal quotations and citations omitted). "'Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.'" Id. (quoting Roberts, 448 U.S. at 66).

Petitioner first challenged the admission of Dennis' testimony in his direct appeal. The OCCA concluded the testimony was properly admitted:

> In his fifteenth assignment of error, Appellant contends that the trial court erred by improperly allowing the testimony of Sue Dennis. Sue Dennis was the bailiff who was present at the hearing on Inaam's Application for a Victim Protection Order against Appellant. Where one spouse commits a crime against the other spouse, evidence of protective orders issued against the offending spouse may be admissible to show motive, malice or intent, where intent is an issue. Rowland v. State, 817 P.2d 263, 267 (Okl. Cr. 1991). Here evidence of the protective order was admissible to establish intent and motive. We find no error.

Al-Mosawi I, 929 P.2d at 284.

We question whether the rationale employed by the OCCA can be classified as a "firmly rooted" hearsay exception. Although it is true that Oklahoma case law permits evidence of protective orders to be admitted in order to prove such things as motive or intent, see Rowland v. State, 817 P.2d 263, 267 (Okla. Crim. App. 1991), there is no indication that this rule was intended to allow a witness to

11

provide hearsay testimony regarding what was said during a hearing preceding the issuance of such a protective order. Indeed, such hearsay testimony would presumably have to be admitted on separate grounds.

Even assuming, arguendo, that Dennis' statements did not fall within a firmly rooted hearsay exception and should not have been admitted by the trial court, we are persuaded that any resulting violation of petitioner's Sixth Amendment rights was harmless. See Crespin v. New Mexico, 144 F.3d 641, 649 (10th Cir.) (holding that violation of Confrontation Clause is trial error subject to harmless error analysis), cert. denied, 525 U.S. 950 (1998). Dennis was merely one of several witnesses who testified at trial that petitioner and Inaam had experienced marital difficulties and that petitioner had threatened to kill Inaam. Fatima testified that problems began immediately following the marriage of petitioner and Inaam in Saudi Arabia and Inaam was very unhappy. Fatima further testified that, during a hospital visit shortly after Inaam gave birth to her son, petitioner became upset over the name Inaam intended to give the baby and threatened to kill Inaam, Fatima and Mohammad. Josephine Warden, the director of the Oklahoma Refugee Resettlement Program, testified that on November 8, 1992, after informing petitioner that Inaam wanted a divorce, petitioner stated he would kill Inaam and himself if he could not have custody of their infant son. Zayneb Attia, one of the Oklahoma sponsors for petitioner and his family,

12

likewise testified that petitioner threatened to kill Inaam after learning that she wanted a divorce.

More important, the evidence of petitioner's responsibility for the murders of Inaam and Mohammad and the assault on Fatima was overwhelming. Fatima, the only surviving victim of the attack, outlined in detail the events leading up to the attack, as well as many of the important details of the attack itself. Fatima's testimony was bolstered by the physical evidence (e.g., the wounds to the victims, blood trails throughout the apartment complex), as well as by the testimony of several neighbors who witnessed petitioner chasing Inaam through the apartment complex parking lot, capturing her, repeatedly stabbing her until she fell to the ground, and then subsequently walking around the complex holding a knife. In light of this evidence, we conclude that any error in the admission of Dennis' testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 622 (1993).

The threshold question in reviewing petitioner's challenge to the admission of Abraham's testimony is whether the issue was presented to the Oklahoma state courts. Petitioner contends it was raised in his direct appeal, noting that both the "Statement of Facts" and "Arguments" sections of his direct appeal brief outlined Abraham's role at the VPO hearing. What petitioner ignores, however, is that his

13

direct appeal brief never specifically challenged the admission of Abraham's testimony. Indeed, a review of the argument section now cited by petitioner indicates that petitioner challenged only the admission of Ms. Dennis' testimony. See Direct Appeal Br. at 71 ("THE STATE WAS ALLOWED TO CALL THE BAILIFF FROM ANOTHER COURT TO TESTIFY TO THE PROCEEDINGS AND EVIDENCE OFFERED IN THAT COURT, NONE OF WHICH HAD BEEN RECORDED BY THE COURT."). This is confirmed by a review of the OCCA's decision disposing of petitioner's direct appeal. Although the decision discusses petitioner's challenge to the admission of Dennis' testimony, it makes no mention of any challenge to the admission of Abraham's testimony. See Al-Mosawi I, 929 P.2d at 284.

Because petitioner never presented this issue to the Oklahoma courts, it is technically unexhausted. See Jones v. Gibson, 206 F.3d 946, 955 (10th Cir.), cert. denied, 2000 WL 1512705 (2000). Generally speaking, a state prisoner must first exhaust available state court remedies before seeking federal habeas relief on a particular claim. See 28 U.S.C. § 2254(b)(1); Demarest v. Price, 130 F.3d 922, 932 (10th Cir. 1997). If, however, the state courts would find the claim procedurally barred on independent and adequate state procedural grounds, the claim will be deemed exhausted for purposes of federal habeas review, and the petitioner need not first seek relief in the state courts. See generally Smallwood

14

v. Gibson, 191 F.3d 1257, 1267 (10th Cir. 1999), cert. denied, 121 S.Ct. 88 (2000). That is precisely the case here. Although petitioner could challenge the admission of Abraham's testimony in a second application for post-conviction relief, a review of Oklahoma's post-conviction relief statute for capital cases indicates the claim would be deemed procedurally barred. In particular, "Oklahoma law deems waived any claims that could have been and were not raised in a first application for post-conviction relief in a death penalty case." Smallwood, 191 F.3d at 1267 (citing Okla. Stat. Ann. tit. 22, §§ 1089(D)(2) and (D)(8)). Accordingly, we must treat the claim as if it were exhausted. Id.

Importantly, the procedural bar that allows petitioner to surmount the exhaustion hurdle renders his challenge to the admission of Abraham's testimony unreviewable. We "will not consider issues on habeas review 'that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice.'" Id. (quoting English v. Cody, 146 F.3d 1257, 1259 (10th Cir. 1998)). Further, we have held that Oklahoma's procedural bar to most claims not raised on direct appeal is independent and adequate. See Brecheen v. Reynolds, 41 F.3d 1343, 1356 (10th Cir. 1994). Finally, petitioner has not attempted to demonstrate cause and prejudice for his failure to challenge the admission of Abraham's testimony in his direct appeal or in his first application

15

for post-conviction relief, nor has he made a colorable showing of factual innocence (the prerequisite for showing that failure to review his claim would result in a fundamental miscarriage of justice).

*Ineffective assistance of trial counsel-failure to present mitigating evidence*

Petitioner contends his trial counsel was ineffective for failing to investigate and present available mitigating evidence. In particular, petitioner contends his trial counsel should have discovered and presented the following items of evidence during the second-stage proceedings: (1) evidence of petitioner's upbringing in Iraq, including the fact that his father died at the age of 37, leaving petitioner, the eldest child, to fend for himself, his mother, and his five younger siblings; (2) the fact that petitioner's first wife contracted a contagious disease, rendering her unable to care for their children; (3) petitioner's lengthy exposure to acts of war and oppression by the Iraqi government to religious minorities (of which petitioner was a member) while he lived in Iraq, including the kidnaping and presumed killing of one of his sons; (4) petitioner's decision to escape Iraq and flee to Saudi Arabia to escape Saddam Hussein's regime; (5) the difficult living conditions of the refugee camp where petitioner and his family were confined for a period of approximately a year and a half; (6) petitioner's difficulties in adapting to American culture; and (7) evidence that

16

petitioner suffered (and continues to suffer) from depression and post-traumatic stress disorder.

Petitioner first raised the claim in his application for post-conviction relief. The OCCA concluded it was procedurally barred due to petitioner's failure to raise it on direct appeal:

> In Proposition[] . . . III, Petitioner also argues ineffective assistance of trial counsel. Ineffective assistance of trial counsel claims are properly before this Court only if they require fact-finding outside the appeal record. 22 O.S.Supp. 1995, § 1089(D)(4)(b)(1). The category of items requiring fact-finding outside the direct appeal record does not include those items that trial counsel had the ability to discover. Moreover, "[s]tated in prohibitive terms, this Court may not review [Petitioner's] post-conviction claims of ineffective assistance of trial counsel if the facts generating those claims were available to [Petitioner's] direct appeal attorney and thus either *were* or *could have been* used in his direct appeal." Ineffective assistance of trial counsel claims in this case do not turn on facts (information) unavailable at the time of his direct appeal. Petitioner has failed to show that appellate counsel could not have obtained the information in question for purposes of raising the issues on appeal, therefore, the claims are waived because they could have been raised on direct appeal. Petitioner has failed to meet the pre-conditions for review of his claims on the merits and the claims are barred.

Al-Mosawi II, 956 P.2d at 909-10 (internal citations omitted).

The initial question we must address is whether the OCCA's resolution of petitioner's claim on state procedural grounds means the claim is also procedurally barred for purposes of federal habeas review. In English, we outlined a framework for determining when the state procedural bar to an ineffective assistance of trial counsel claim is adequate for purposes of federal

17

habeas review:

> [T]he Oklahoma bar will apply in those limited cases meeting the following two conditions: trial and appellate counsel differ; and the ineffectiveness claim can be resolved upon the trial record alone. All other ineffectiveness claims are procedurally barred only if Oklahoma's special appellate remand rule for ineffectiveness claims is adequately and evenhandedly applied.

146 F.3d at 1264.

Petitioner contends the first element of the English framework is not met because, although he was represented at trial and on appeal by different attorneys, both attorneys worked for the same office (the Oklahoma County Public Defender's Office) and should be considered the same for purposes of the procedural bar rules. More specifically, petitioner contends that "[t]he circumstances create an inference, at least, that appellate counsel was not truly independent of her colleague within the Public Defenders Office." Petitioner's Opening Br. at 31. We find it unnecessary to decide this issue because, regardless of whether the first element of the English test can be satisfied, it is clear that the second element has not been met. Although some of the general areas of mitigation evidence now cited by petitioner were touched upon by petitioner during his first-stage testimony (as well as by other witnesses at trial), not all of the available mitigation evidence cited by petitioner was contained within the trial record. For example, petitioner presented in connection with his application for post-conviction relief, and continues to rely upon in these federal habeas

18

proceedings, a psychological evaluation conducted in May 1997 by clinical psychologist Dr. Saleem Ateek.

Because petitioner's ineffective assistance of trial counsel claim is not procedurally barred, we must determine its merit. Our review of this issue is de novo since the OCCA did not decide the issue on the merits. Evaluating the effectiveness of trial counsel assistance requires a two-part inquiry. Petitioner must prove that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).

Assuming, arguendo, that trial counsel's failure to investigate and present the mitigating evidence caused his performance to fall below an objective standard of reasonableness, there are two reasons petitioner was not prejudiced. First, some of the general areas of mitigation evidence were touched upon during the first and second stages of trial. For example, during the first stage proceedings, petitioner testified that (1) he was born and raised in Iraq, (2) his father died when he was a young boy, leaving him to take care of his large family, (3) he worked as an electrical technician for an Iraqi courthouse, (3) he left Iraq due to problems with the Iraqi government, and (4) many refugees in the Saudi Arabia camp were killed by the Saudi Arabian army. During the second stage

19

proceedings, Dr. Haisim Al-Khouri, a second-year resident in psychiatry, testified that petitioner was suffering from depression and had in fact been treated for depression while living in the refugee camp in Saudi Arabia. Defense counsel, during his second-stage closing argument, asked the jury to consider the fact that petitioner lived in Iraq during a time of upheaval and antagonism by the government toward many of its citizens. Although all of the evidence now pointed to by petitioner was not presented to the jury, the jury was able to make an individualized determination in considering what sentences to impose on petitioner. Second, given the horrific nature of the murders, we are not persuaded that any of the mitigating evidence would have been sufficient to explain, justify, or offset the attack.[2] See, e.g., Nguyen v. Reynolds, 131 F.3d 1340, 1349 (10th Cir. 1997) (concluding that additional mitigating evidence would have been

---

[2] Dr. Ateek, the psychiatrist retained by petitioner after trial, apparently opined that petitioner's "religious and cultural background, coupled with depression and isolation caused by his refugee experiences, could very well have led him to perceive the events in a way that conflicts with the evidence." Petitioner's Opening Br. at 50. Considering the evidence presented at trial, however, we are not persuaded there is a reasonable probability that Dr. Ateek's testimony would have altered the outcome of the second-stage proceedings. During the first-stage proceedings, petitioner denied wielding a knife or attacking any of the victims. Instead, petitioner testified that the deaths occurred because Mohammad and Fatima attacked him with knives and, in the process of doing so, critically injured each other and Inaam (but left petitioner with few injuries). Given the incredible nature of this testimony, we are skeptical that Dr. Ateek could have persuaded the jury that petitioner legitimately perceived the events in the way he related at trial.

20

insufficient to alter the outcome of the second-stage proceedings, given the horrific nature of the petitioner's crimes), cert. denied, 525 U.S. 852 (1998). In other words, we are not persuaded there is a reasonable probability that the outcome of the second-stage proceedings would have been different had defense counsel presented all of the mitigation evidence now pointed to by petitioner.

*Ineffective assistance of appellate counsel*

Petitioner contends his appellate counsel was ineffective for failing to assert on direct appeal the ineffectiveness of trial counsel's performance at the second-stage proceedings (i.e., the issue now raised by petitioner and discussed above). Petitioner first raised this issue in his application for post-conviction relief. The OCCA concluded that appellate counsel's omission of the issue did not "render[] her performance unreasonable under prevailing professional norms." Al-Mosawi II, 956 P.2d at 909.

When claiming ineffective assistance of appellate counsel, a petitioner must show both constitutionally deficient performance and prejudice as required by Strickland v. Washington, 466 U.S. 668 (1984). See Moore v. Gibson, 195 F.3d 1152, 1180 (10th Cir. 1999), cert. denied, 120 S.Ct. 2206 (2000). "An appellate counsel's performance may be deficient and may prejudice the defendant only if counsel fails to argue a 'dead-bang winner.'" Id.

21

For the reasons outlined above, we conclude petitioner was not prejudiced by trial counsel's alleged failure to investigate and present the items of mitigating evidence now pointed to by petitioner. Thus, appellate counsel's failure to raise the issue on direct appeal cannot be deemed constitutionally ineffective assistance of counsel. In other words, because the ineffective assistance of counsel claim is not a "dead-bang winner," appellate counsel did not deliver a constitutionally deficient performance by omitting the issue on direct appeal.

III.

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

22